## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LESLIE J. REYNARD                          )
                                           )
      Plaintiff,                     )
                                           )    Case No. 5:19-CV-04012-HLT-TJJ
v.                                         )
                                           )
WASHBURN UNIVERSITY OF TOPEKA              )
                                           )
      Defendant.                     )

## COMPLAINT

COMES NOW Plaintiff Leslie J. Reynard, by and through her undersigned attorneys, and alleges the following in support of her cause of action against Defendant Washburn University of Topeka (hereinafter, "Washburn"):

## THE PARTIES

1.    Plaintiff is a female, over the age of 40.

2.    At all times relevant hereto she has been employed by Defendant Washburn in Topeka, Kansas as a tenured full professor in the Communication Department of the College of Arts and Sciences.

3.    Plaintiff, while employed by Defendant, has always taught at least one class in Defendant's School of Business.

4.    Defendant Washburn University is a public university in the state of Kansas. Upon information and belief, the university receives  federal and state funding, and is responsible for creating, adopting, and implementing the policies, practices, and/or customs regarding the rights of its employees to speak freely on matters of public concern and preservation of due process rights.

5.     At all times pertinent hereto, Defendant Washburn University was a "person" acting under color of state law.

## JURISDICTION AND VENUE

6.     This court has jurisdiction over this case pursuant to 28 U.S.C. §1331, and further, pursuant to the civil rights acts invoked herein, as it is a court of competent jurisdiction.

7.     With respect to Plaintiff's state common law claims, the Court has supplemental jurisdiction, pursuant to 28 U.S.C. §1367.

8.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because all of the events giving rise to Plaintiff's claims occurred in this Judicial District.

## ADMINISTRATIVE PROCEEDINGS

9.     On or about April 18, 2018, Plaintiff initiated a timely Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") raising claims of sex discrimination under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), violations of the Equal Pay Act of 1963 ("EPA"), the Age Discrimination in Employment Act of 1967 ("ADEA"), and the Americans with Disabilities Act of 1990 ("ADA"); that Charge, 563-2018-01686, was opened on or about August 15, 2018 subsequent to EEOC intake interview.

10.     On or about August 24, 2018, Plaintiff filed a second timely Charge of Discrimination, Charge 563-2018-02836, with the EEOC, claiming retaliation for the filing of the first charge, Charge 563-2018-01686, as well as for additional acts of age, gender, and disability discrimination.

11.     The allegations asserted in both discrimination charges are incorporated by reference, as if more fully set forth herein.

12.     On or about November 20, 2018, the EEOC issued a right-to-sue notice for the second charge, Charge 563-2018-02836, which Plaintiff received on or about November 24, 2018.

13.     On February 18, 2019, Plaintiff filed suit in the United States District Court for the District of Kansas, Case No. 19-4012-HLT-TJ, the facts and claims of which are incorporated hereto by reference.  This case pertains to the first right-to-sue notice.

14.     On or about April 19, 2019, the EEOC issued a right-to-sue notice for the first charge, Charge 563-2018-01686, which Plaintiff received on or about April 22, 2019.

15.     This action is brought pursuant to the first charge, Charge 563-2018-01686, and has been filed with this Court within 90 days of Plaintiff's receipt of her right-to-sue notice from the EEOC for the first charge.

16.     Plaintiff has, therefore, fully complied with all administrative prerequisites before filing this action.

## FACTS PERTINENT TO ALL COUNTS

17.     Plaintiff accepted employment as a tenure-track faculty member on or about April 10, 2007, after being invited to interview for that position by then-Chair Meredith Moore who was tasked with replacing a faculty member who had unexpectedly resigned the previous month, despite receiving advice from peers and her mentor that the Washburn Communication Department was "not a good fit."

18.     Plaintiff began her employment at Washburn University in August 2007.

19.     Throughout Plaintiff's employment she has been a tenure-track faculty member, earning tenure and early promotion to Associate Professor on or about August 1, 2010 and later, to full Professor on or about August 1, 2016.

20.     Throughout her employment, Plaintiff has taught courses in the Communication Department, as well as courses cross-listed with the Mass Media Department, the English Department, and in the Honors Program; she also taught a course in the School of Business for several semesters, BU302, which was cross-listed with a Communication Department course. The first semester Plaintiff taught BU302, she was nominated for the Dicus Excellence in Teaching Award which is based upon nominations from the student body of the School of Business.

21.     On April 13, 2007, on or about the day that he received Plaintiff's signed contract accepting employment as a Washburn University tenure-track Assistant Professor in the Communication Department, then-CAS Dean Dr. Gordon McQuere sent an email to Dr. Meredith Moore (then CN Department Chair), with copies to Dr. Laura Stephenson (then Associate CAS Dean), Dr. Bruce MacTavish (then Assistant CAS Dean) and Dr. Carol Vogel (then CAS faculty serving as the University's "EEOC liaison") asking for statistics on the past several years of searches for the constant openings for tenure-track Associate Professors in the Communication Department. He wanted numbers broken down by gender. In this email, Dean McQuere stated that hiring a "tenure track man" in the Communication department was to be made a priority, declaring, "*We really do need to find a way to get a male tenure-track person in CN!*"

22.     Dr. Carol Vogel responded to Dean McQuere's  email the same day, taking issue not with the fact that such a mind-set and objective is problematic under EEOC and affirmative action legislation, but that the Dean's gender-biased objectives should not be put into writing, stating:

"*Gordon, I am a bit uncomfortable with the statement of "needing to find a way to get a male tenure-track person in CN" – While that gender is underrepresented ... I think I know where you are coming from and applaud the awareness that a more diverse faculty composition would be good ... I am likely preaching to the choir, but I felt compelled to make a note of it.*"

23.     Dr. Meredith Moore forwarded that message to another Assistant Professor in the Communication Department and then, shortly after Plaintiff reported for work in August, Dr. Moore discussed the Dean's message with her, noting that *History and Philosophy have* [at that time] *had no women ... but apparently that is not a problem.*

24.     In January 2009, Dr. Meredith Moore, Communication Department Chair, announced she was retiring at the end of that semester.  Dr. Gordon McQuere, CAS Dean briefly discussed the issue of replacing a Chair when there was no tenured faculty member to take her place.

25.     Until approximately 2009, despite nearly annual searches and hiring of tenure-track faculty members in Communication, no one had earned tenure or promotion; Dr. Moore was the only tenured faculty member in the Department until a female faculty member over the age of 40 received tenure and promotion. That newly tenured Associate Professor would have been the logical person to have been named department chair after Dr. Moore's retirement. However, for personal reasons, she voluntarily stepped aside to allow for (what was believed to be) a temporary chairperson to be appointed.

26.     In resolving the issue of a Chair-less Communication Department, Dean McQuere mentioned the possibility of a.) reuniting with the Mass Media Department; b.) having someone

outside the department be chair; or c.) having a non-yet-tenured tenure-track faculty member become Chair.

27.   After informal discussions, Mr. Steve Doubledee (an Lecturer, a non-tenure-track contingent faculty position) suggested that Dr. Tracy Routsong, a not-yet-tenured Assistant Professor under the age of 40, become "interim co-chair" upon Dr. Moore's retirement.  Dr. McQuere did appoint Dr. Routsong to be co-chair with Dr. Laura Stephenson, Associate CAS Dean, by-passing the newly tenured and promoted Associate Professor, the aforementioned female over age 40.

28.   Shortly after Dr. Routsong's appointment as "temporary" Chair, Dr. Stephenson told Dr. Mary Pilgram, another tenure-track Assistant Professor in the Communication Department that the older female Associate Professor "had better change her attitude" or her job could be in jeopardy. This was quite surprising to Plaintiff, who had known and admired that Associate Professor as an excellent professor, and, to say the least, disagreed with such an assessment.

29.   Ultimately, however, Dr. James Schnoebelen, a Lecturer (a contingent faculty member) became the first tenured male in CN Studies, once he completed his PhD approximately 18 months later, and a tenure-track opening was created through the process of terminating the employment of the older, female Associate Professor "for cause."

30.   Plaintiff's experiences in the Communication Department closely mirrored those of the terminated Associate Professor.  Documentation filed with the EEOC Charge under which this suit is filed demonstrates that Plaintiff was originally targeted for elimination during the 2009-2010 time frame that Dr. Schnoebelen's PhD completion approached, but Dr. Routsong

(then Chair) and Dr. McQuere (then CAS Dean) were able to focus on an "actionable" complaint by a student that more easily facilitated terminating the other Associate Professor.

31.     Plaintiff was one of three female tenure-track Assistant Professors hired in the spring-summer, 2007; the other two were Dr. Mary Pilgram (a female over age 40) and Dr. Tracy Routsong, a female under age 40.

32.     Plaintiff and Dr. Routsong submitted applications for promotion and tenure in the fall of 2010.

33.     Plaintiff's and Dr. Routsong's petitions for promotion and tenure were accepted and both were promoted and awarded the rank of "Associate Professor" early. Dr. Routsong's early promotion and grant of tenure allowed her to be named "permanent" Department Chair.

34.     The older female Associate Professor who was not named Chair learned that a contingent faculty member in the Communication Department, Lecturer Dr. Kevin O'Leary, was teaching Public Speaking online at Allen County Community College. Plaintiff checked online and saw that Dr. O'Leary was listed as an Lecturer there.

35.     Other Lecturers (female) had asked to teach for online institutions and were told if they did, they would be fired. The older Associate Professor told Kevin that she had heard this and suggested he speak to Dr. Routsong about outside teaching, to get permission. Drs. Routsong and O'Leary met with Dr. McQuere.  Apparently, Dr. O'Leary pleaded ignorance as to  the policy and the Dean allowed him to continue teaching at another institution.

36.     "Conflict of interest" employment as teaching for other institutions has been a bone of contention among faculty–Washburn's faculty wages are quite a bit below the market average for public universities, even in Kansas.

37.     At the time of Plaintiff's EEOC filing, outside teaching is even more overtly and strictly prohibited – even for faculty who are in phased retirement (as Plaintiff was clearly told when she met with CAS Dean Laura Stephenson in spring, 2018). Thus, Dr. O'Leary's being permitted to continue his outside teaching was disturbing to those who were forbidden to do so. Plaintiff was specifically admonished by Dean Stephenson that, should she be awarded phased retirement, she would not be permitted to teach anywhere that might attract away actual or prospective Washburn students.

38.     On January 21, 2012, Dr. Tracy Routsong emailed the Department that we would be transitioning the Lecturer position into a tenure track Assistant Professor position.  She stated, "the position is for a generalist, with strength in Political Communication, preference given to someone who can successfully coordinate and direct a mock trial team." We noticed that that sounded like an exact description of James Schnoebelen, who was close to completing his doctorate. His area dissertation focus was in political communication and one of his assigned responsibilities at Washburn as a Lecturer was to coordinate the Mock Trial team.  It appeared to Plaintiff that Washburn was advertising her position in the Department, planning to replace her with James Schnoebelen once he completed his doctorate.

39.     Dr. Tracy Routsong stated in her email that this was confirmed by "The Dean's Office."  Thus, it can be concluded that Dr. Gordon McQuere, Dean CAS, made the decision to transition the Lecturer directly to the Assistant Professor position– activity that is explicitly prohibited by the *Faculty Handbook*.

40.     Further, it means it is likely means that he cooperated in the creation of the position description specifically tailored to Dr. Jim Schnoebelen, in order to achieve the stated objective of his April 13, 2007 email to Moore.

41.     The focus of the job description was problematic from a discrimination perspective for several reasons: First, of the four emphases in the CN department, political communication had the fewest number of students declaring it, declining each year (along with the total declared Communication majors).

42.     Second, Plaintiff had been successfully teaching the lead course, *Political Communication*, since her hiring, including once team-teaching it with Dr. Bob Beatty, a renowned Political Science professor, at his invitation.  Political communication is Plaintiff's major field of expertise, especially the areas of peace and conflict, and conflict and crisis management from an interdisciplinary perspective.

43.     Third, Plaintiff had published research in this area and received a National Communication Association Excellence in Research award related to her scholarship in this field, an award that is juried and that is not awarded every year.

44.     Plaintiff was invited to facilitate the Mabee Library Debate Watch events during all of the Presidential election cycles (including the most recent in 2016). Plaintiff created and facilitated a political Town Hall after the 20012 election, bringing together students, faculty, and local citizens with Kansas candidates, both successful and not. I had been developing a sound reputation as a scholar and practitioner of political communication and related strategic communication.

45.     Plaintiff was disturbed that this job description not only marginalized the resources already available in the Department, it also signaled to anyone who saw the ad that she was being set aside and replaced despite her expertise and efforts, which was demoralizing and humiliating.

46.     Concurrent with the "search" for a new tenure-track Political Communication faculty member, then-Chair Tracy Routsong made two separate visits to Plaintiff's office to advise her that she and then-Dean Gordon McQuere had met and that she was to let Plaintiff know that the Dean felt it would be all right to bend the rules to allow Plaintiff to take early retirement.

47.     Though Plaintiff had requested early retirement, she had not considered taking early retirement, did not want early retirement, and Plaintiff found the suggestion offensive.

48.     Plaintiff sent several emails detailing the situation Dr. Carol Vogel, EEOC liaison for Washburn, and met with her. Dr.

49.     Vogel took notes and said she would follow up on the issue, but Plaintiff did not hear further from her. Plaintiff had met with Dr. Vogel at least three other times relative to Plaintiff's experiences within the Department and College of Arts and Sciences, raising issues of gender and age discrimination. While Dr. Vogel was always available to hear these complaints, took notes and promised follow-up, there was never a tangible result in which the practices were discontinued, the discriminatory actions ceased, or the Plaintiff's workplace situation improved. In this instance, the "search" for the new tenure-track political communication position continued.

50.     Mr. Steve Doubledee (a contingent instructor with an master's degree) was appointed to head the departmental search committee.

51.     Upon information and belief, Mr. Doubledee presented negative input about the only other candidate to apply for the position, which he later withdrew, apparently in order to ensure that James Schnoebelen would transition from Lecture to Assistant Professor– a move specifically prohibited by the Faculty Handbook.

52.     Dr. Tracy Routsong sent an email that indicated that all faculty in the department, both tenure-track and contingent instructors, were to be on the search committee:  Dr. Routsong bypassed the established departmental practice of having only tenure track faculty on the search committee for an Assistant Professor position.

53.     Plaintiff declined to serve on the search committee, thinking that she had the right to do so since such service had been optional in the past, with search committee work being voluntary. She also made another appointment with Dr. Carol Vogel to file a report and complaint about the parameters and objectives of the search.

54.     The other older, female Associate Professor (subsequently terminated from her position "for cause") also made an appointment to speak with Carol Vogel regarding the membership of this committee. The other Associate Professor found the inclusion of Dr. Kevin O'Leary to be problematic. Dr. O'Leary was hired in 2003 as the Director of Debate and Forensics, a non-tenure-track appointment, and James Schnoebelen, at that time a doctoral student and the Assistant Director of Debate and Forensics at Washburn, had also interviewed for the same position.

55.     In approximately 2008, Dr. Kevin O'Leary and Dr. Meredith Moore attempted to fire James Schnoebelen without following the protocol identified in the Faculty Handbook. Because the other older female Associate Professor had also earned a law degree, she was able to counsel James Schnoebelen as to due process. With her assistance, Schnoebelen was able to retain his job. After the end of the academic year, it was renewed for the next year and each subsequent year.

56.     It did not seem appropriate to either Plaintiff or the other older female Associate Professor that Dr. O'Leary should be on the search committee for the position that Schnoebelen

would obviously be applying for, when O'Leary had recently tried to have him fired. Apparently, Dr. Vogel agreed, because O'Leary was removed from the search committee.

57.     In late February or early March 2010, it was made known that Dr. Routsong, still not tenured, had been named Chair for the following year, although the older female Associate Professor had believed she would be named to this position having resolved certain issues that had caused her to postpone accepting the appointment. The Dean's decision to appoint a more junior, less experienced person to be Chair in the stead of any of the other three tenured faculty members, Plaintiff included, was made unilaterally without put from Communication faculty.

58.     Review of Washburn Board of Regents minutes demonstrates that, historically, very few faculty members are granted an unpaid leave of absence. The exception would be the mandated leave under circumstances that meet FMLA requirements. As is demonstrated in Plaintiff's filing for a leave of absence under the FMLA in Fall of 2015, this is not easily obtained, even when mandated by law. Dr. Kathy Menzie, then Communication Studies Chair, stated in an email that Dean Stephenson didn't want to grant Plaintiff leave under the FMLA, but was required to do so insofar as Plaintiff had provided requisite documentation for leave.

59.     Plaintiff discovered in 2008 that the Washburn University Board of Regents Bylaws carried a requirement for mandatory retirement at age 70. She met with Dr. Carol Vogel to discuss this age "cap" as being illegal and discriminatory. Dr. Vogel was aware of the mandatory retirement provision but said, "Oh we aren't enforcing that." Plaintiff stated that she felt that it created an atmosphere in which older faculty would feel unwelcome and that she felt unwelcome due to her age, which was approaching the "cap." Plaintiff stated that this was especially so given the two visits by Chair Tracy Routsong carrying then-Dean McQuere's invitation to take early retirement and the campaign calling on older faculty to take "voluntary

retirement" buy-outs. There have been two such "voluntary retirement" buy-out campaigns during Plaintiff's tenure at Washburn between 2008 and the present.

60.     On or about February 22, 2012, Plaintiff met with Professor Richard Martin and Professor Barry Crawford, officers of Washburn's chapter of the American Association of University Professors, to discuss the ongoing issues of age and gender discrimination, hostile work environment, and her failed efforts to manage these situations by speaking with her department Chairs, Dr. Carol Vogel, or the Dean's office (which several times declined to participate in requested meetings). Both AAUP officers were surprised to hear of the mandatory retirement clause in the By-Laws and suggested that they would look into it. Plaintiff did not hear further from either party, nor did she have any response to a report of issues that she filed with a subsequent Washburn AAUP chapter president.

61.     Plaintiff was assigned an involuntary overload in Spring 2014 by Dr. Laura Stephenson and Dr. Kathy Menzie (then-Chair) when she was required to oversee, as instructor of record, a new adjunct instructor who required supervision and training.  This, in addition to her regular course load, gave her responsibility a fifth course, CN150 (a gen ed course in Public Speaking). This occurred when the CN101 general education course previously assigned to Plaintiff and which she had prepped was transferred from Plaintiff to James Schnoebelen to instruct just before the semester began.  Dr. Menzie reported to Plaintiff that Dean Stephenson instructed her to "force her" [Plaintiff] to accept the last-minute change and to take the additional assignment.

62.     An additional requirement developed requiring that Plaintiff create and teach a Saturday CN150 Public Speaking course. To Plaintiff's knowledge, no other Communication

faculty has had to teach on Saturdays prior to this. Plaintiff does not believe that any

Communication Studies faculty have had to teach on Saturdays since then.

      63.     In an email to then-Chair Kathy Menzie dated February 4, 2014, Plaintiff raised

these issues [quoting from that message in pertinent part]:

> "This brings me to a couple of concerns I wanted to talk over with you.
> I was hoping we could meet and talk, but the available time has been unbelievably
> short since the semester began.
>
> 1.    *What alternatives to "forcing" me to take this course, if any, did Laura*
> *offer in the event I could not do it, given my medical / disability accommodation*
> *needs?*
> 2.    *Why, if you know, did Laura tell you to "force" me to take this course,*
> *when other CN faculty are on campus on MWF or not being asked to teach any*
> *on-campus courses.*
> 3.    *What specific requirements are imposed on and expected of me as*
> *"instructor of record"?*
> 4.    *What is the actual mandate from the Dean's office relative to my*
> *responsibility for this class?*
>
> I interpret it that Laura has placed an obligation on me to take on this fifth course
> as "instructor of record." Although the fiat did not come to me directly from her,
> and you have done your best to make it something that "we" (you and I) are doing
> to meet that fiat, I am confused about what the "official" requirements on me are
> relative to this fifth course that became part of my workload in mid-January.
>
> As I understood it, Laura expected me (or you?) to attend each of the MWF
> sessions, despite my ADA accommodation request on file relating to a schedule
> that allows me to obtain ongoing medical treatment which I have historically
> arranged on Wednesdays. The last-minute nature of replacing Sarah's courses -
> just a week or two before the semester began and when the Spring schedules were
> set in place in early fall - made it impossible for me to reorganize my medical
> appointment schedule.
>
> This is troubling to me for a number of reasons:
>
> •    I must increase my medical treatment for the foreseeable future at least
> and the expectation that I will drive 45 miles each way to observe Carole's class
> compromises my ability to make appointments as needed.
> •    If not for this additional course, my on-campus teaching obligations would
> be solely on Saturday, piloting an innovative "hybrid" approach that assists in
> classroom management during the coming construction period and helping serve
> the needs of some under-served student populations.

> •      No other CN faculty must manage or be responsible for five classes - most, if not all, are only teaching three CN classes, and many of those are only online.
> •      If I am required to attend this course, it would seem more reasonable to move it to a later time, let me teach it, and let me move my CN365 class to those days as well and cancel the hybrid CN150, rather than adding a fifth course and a four-day teaching week to my course load.

64.      Plaintiff was not compensated for the assignment as instructor of record for the fifth course, responsible for training, supervising and reporting on the work being done by the newly hired adjunct instructor.

65.      As a matter of practice, Plaintiff's requests for certain teaching assignments were often given lower priority in making those assignments than the requests of male and/or younger faculty. Summer teaching has been an ongoing issue of this type. Following the norms and practices generally observed at universities, tenured faculty, especially full professors, are given priority in teaching assignments over contingent or adjunct faculty, especially those who have not earned a terminal degree and/or do not do research or make scholarly presentations and/or who do not participate in faculty development or other efforts to improve pedagogy. Evidence demonstrates that contingent faculty (all male) have historically been given a privileged position over tenured faculty in summer teaching assignments and, increasingly, in regular semester teaching assignments.

66.      Although she had not yet earned her doctorate at The University of Kansas, an adjunct instructor, Alex Wages, was assigned to teach Communication Theory, a course Plaintiff is highly qualified to teach, and which Plaintiff wanted to teach, and which Plaintiff asked to teach.

67.     Although he has not earned a doctorate, a non-tenure-track lecturer Steve Doubledee, was assigned to teach Environmental Communication, a course Plaintiff is highly qualified to teach, and which Plaintiff wanted to teach, and which Plaintiff asked to teach.

68.     In 2011, Plaintiff and another tenured female Associate Professor, both in the protected age class, both told then-Chair Tracy Routsong that they wished to teach Communication Theory, as both have a strong background of publication and research bringing those theories to bear.  Dr. Routsong said the course was already assigned to Dr. Kevin O'Leary, Director of Debate, a lecturer who had already taken the opportunity to teach that course the previous four years. Dr. O'Leary has no publications, no research agenda, no professional development activities related to pedagogy that are known to Plaintiff. or activities that are known to Plaintiff.

69.     In spring of 2016, when then-Chair Kathy Menzie assigned Plaintiff to teach a summer course in Communication Theory, since it was her "turn," Dr. O'Leary approached Plaintiff, angry about it, and asked if she would consider teaching it the following summer and allow him to teach it again that summer. Plaintiff declined, stating that she needed the income since she'd been on reduced salary due to sabbatical and FMLA leave, and that she "could be dead by then." Dr. O'Leary then said, "Well that would be too bad, but it would certainly solve a lot of problems." When Plaintiff brought this to the attention of Dr. Menzie as an example of incivility she'd been experiencing and which needed to be administratively dealt with, Dr. Menzie said, "That's terrible," but to Plaintiff's knowledge, no admonishment or other effort to create a more hospitable workplace took place.

70.     To the contrary, Plaintiff's working conditions became worse. When Plaintiff filed paperwork to become a Washburn faculty member, she indicated that she was a person with

a disability; she has documented this disability with all employers, including The University of Kansas, Indiana University, and Southern Illinois University Edwardsville. The neurological condition is one which she has managed since childhood and, in a more severe form, since 1979. The condition is triggered by certain forms of light such as fluorescent and LED bulbs plus heavy, internalized stress. Informal accommodation relating to lighting – avoidance of fluorescent light and, ideally, assignment in rooms or offices with natural light – had managed the condition for almost 40 years.

71.     In mid-August 2018, Plaintiff' found that her "usual" classroom in Morgan Hall was being used by the debate team (which already had a dedicated room in the Communication Studies office suite and access to other rooms in Morgan Hall and elsewhere) under the direction of Dr. Kevin O'Leary and Mr. Steve Doubledee, and Plaintiff was assigned to teach in a basement classroom far across campus in Henderson Hall, a room which was lit solely by older, often flickering, fluorescent bulbs.

72.     Plaintiff immediately complained of this classroom assignment and asked to be reassigned to a room where natural light or non-fluorescent light would be available. Dr. James Schnoebelen observed in an email to Communication faculty that he had asked for a different classroom assignment and was moved to a room in Morgan Hall almost immediately. Plaintiff, however, was required to teach in the dangerously lit (she had experienced several serious neurological incidents triggered by light in the past) until mid-October when she was finally able to complete required paperwork and obtain physician's signatures to obtain formal ADA accommodation for the condition which Washburn was aware of and informally had been accommodating for over 10 years.

73.     Plaintiff had to advise her class that a medical issue might develop due to the lighting in the room and give several of them specific information on how to manage the situation should such a condition occur. The first week of October, Plaintiff did experience a trans-ischemic attack (hereinafter, "TIA") which was noticed by one of her students, who asked about it later.

74.     Plaintiff dismissed the class early, made her way back to her office, took medication that had managed the condition in the past and had to lie down on her office floor until the TIA passed and her vision returned.

75.     Since that time, Plaintiff's neurological condition has changed, and Plaintiff has been required to consult with several neurologists (when she had not had to see her neurologist for over 10 years prior to October 2017).

76.     The other older female Associate Professor who was terminated in 2013 was told by Dean Laura Stephenson, as part of the "performance improvement plan" meetings she had with her that the Associate Professor who was targeted for termination was a "toxic" member of the department and Dr. Stephenson had *received "complaints" about her from her colleagues and students.* This statement about "complaints" – none of which is specifically stated nor the source named, which is in violation of the procedures set out for actual complaints in the Faculty Handbook and other administrative procedures documents –  directly mirrors the experiences that Plaintiff has been having with Dean Stephenson since she told her supervisors in April 2018 that she had initiated the EEOC charge that is the foundation of this lawsuit and which the EEOC opened as an investigation on or about August 14, 2018.

77.     Similarly to Plaintiff, the targeted Associate Professor who was terminated "for cause" in 2013 asked what the complaints were, but Dr. Stephenson would not tell her.

According to the fired Associate Professor, Dean Stephenson advised her that she had complained too much about Dr. Kevin O'Leary teaching at ACCC, for one thing.

78.     Current Chair Mary Pilgram emailed Plaintiff on July 5, 2018 that "complaints" against Plaintiff had been received and investigated. She stated that she and Dean Stephenson wanted to arrange a day and time for Plaintiff to meet with them and discuss the "findings." She refused several times to tell Plaintiff what the complaints were and who the complainants were.

79.     The August 15, 2018 meeting to discuss "complaints" and "findings" closely reflects the processes and procedures and language of the termination path that the other older Associate Professor found herself travelling. In response to the allegations being raised by the Dean's office and the Communication Chair, Plaintiff has provided abundant and detailed documentation and evidence that these are baseless; however, Plaintiff's supervisors have disregarded fact-based refutation of the allegations and continue moving forward to intensify the stressful and hostile work environment in which Plaintiff continues to labor.

80.     Having taken a full semester of mandated FMLA leaver for serious medical conditions, many of which are exacerbated by stress, the Dean's office has continued to levy unfounded complaints and allegations against Plaintiff, including a second "performance improvement plan" and an addendum to that second "performance improvement plan," all the while continuing to refuse to provide specifics or name complainants, while ignoring evidence and data that disprove the nebulous allegations.

81.     Shortly after the February 18, 2019, filing of the lawsuit for the EEOC retaliation charge in U. S. District Court, then-Associate Dean Bruce MacTavish contacted certain students in Plaintiff's Organizational Communication class, soliciting input from them as to whether they

were having problems or issues with Plaintiff's teaching of the course and encouraging them to meet with him.

82.     According to Dean Stephenson, "a number" of them did, but she would not identify the students or describe the issues they reported. It should be noted that there were six or seven international students in the class, the majority of whom did not speak, read, or write English at a level that would facilitate their learning.

83.     Additionally, several of them simply did not turn in assigned work or participate in assigned discussion thus, they were not passing the course.

84.     Dean Laura Stephenson notified Plaintiff in April 2019 that she, Dean Stephenson, would replace current Chair Mary Pilgram and incoming Chair James Schnoebelen as Plaintiff's supervisor.

85.     Plaintiff formally notified Dean Stephenson in June 2019 that her ongoing actions are subjecting Plaintiff to extraordinary stress that creates a hazard to her health, reminded Dean Stephenson that she is familiar with the serious, chronic conditions that Plaintiff is managing due to her review of Plaintiff's extensive 2015 FMLA documentation, and requested Dean Stephenson to cease and desist from adding needless stress to Plaintiff's working conditions and simply allow her to do her job.

## CAUSES OF ACTION

### COUNT I.     TITLE VII -- GENDER DISCRIMINATION

86.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

87.     Defendant was an employer for purposes of Title VII of the Civil Rights Act.

88.     Plaintiff is an employee of the Defendant for purposes of the Title VII of the Civil Rights Act.

89.     Plaintiff is female.

90.     Plaintiff was subject to adverse action on the basis of her gender, as more fully set forth above.

91.     The adverse employment actions alleged above directly and proximately caused Plaintiff to suffer damages, including lost wages, lost benefits, emotional distress, humiliation, intimidation, embarrassment, and frustration.

92.     The person or persons described above as employees of Defendant were agents of the Defendant who were acting in the course and scope of their agency with Defendant or who acted with express authority from Defendant.

93.     Defendant, through its agents or employees, acted outrageously by engaging in discriminatory practices with malice or reckless indifference to Plaintiff's federally protected rights.  Defendant is therefore liable for punitive damages in an amount sufficient to punish Defendant and to deter it and other employers from engaging in similar conduct.

WHEREFORE, Plaintiff prays for judgment against Defendant on Count I of her Complaint, for all actual damages and losses shown in evidence, and determined by a jury to be reasonable and fair, including, but not limited to:  an award of lost pay, including lost benefits, bonuses, and cost of living increases; an award of front pay; for any other compensatory damages; for pre-judgment interest;  for pain and suffering and emotional distress; for a finding that she has been subjected to unlawful discrimination in violation of Title VII; for punitive damages, attorneys' fees, and all other damages, expenses, and costs incurred, and for other relief as the Court deems proper and just.

## COUNT II.   AGE DISCRIMINATION

94.     Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

95.     Defendant was an employer for purposes of Title VII of the Civil Rights Act.

96.     Plaintiff is an employee of the Defendant for purposes of the Title VII of the Civil Rights Act.

97.     Plaintiff is over 40 years of age.

98.     Plaintiff was subject to adverse action on the basis of her age, as more fully set forth above.

99.     The adverse employment actions alleged above directly and proximately caused Plaintiff to suffer damages, including lost wages, lost benefits, emotional distress, humiliation, intimidation, embarrassment, and frustration.

100.    The person or persons described above as employees of Defendant were agents of the Defendant who were acting in the course and scope of their agency with Defendant or who acted with express authority from Defendant.

101.    Defendant, through its agents or employees, acted outrageously by engaging in discriminatory practices with malice or reckless indifference to Plaintiff's federally protected rights.  Defendant is therefore liable for punitive damages in an amount sufficient to punish Defendant and to deter it and other employers from engaging in similar conduct.

WHEREFORE, Plaintiff prays for judgment against Defendant on Count II of her Complaint, for all actual damages and losses shown in evidence, and determined by a jury to be reasonable and fair, including, but not limited to:  an award of lost pay, including lost benefits, bonuses, and cost of living increases; an award of front pay; for any other compensatory

damages; for pre-judgment interest;  for pain and suffering and emotional distress; for a finding

that she has been subjected to unlawful discrimination in violation of Title VII; for punitive

damages, attorneys' fees, and all other damages, expenses, and costs incurred, and for other relief

as the Court deems proper and just.

## COUNT III.   DISABILITY DISCRIMINATION

102.    Plaintiff incorporates by reference all preceding paragraphs as though fully set

forth herein.

103.    Defendant was an employer for purposes of the Americans with Disabilities Act.

104.    Plaintiff is an employee of the Defendant for purposes of the Americans with

Disabilities Act.

105.    Plaintiff is suffers from an array of medical conditions, as set forth above, which

limit her major life activities.

106.    Defendant has or should have had knowledge of Plaintiff's condition.

107.    Plaintiff was subject to adverse action on the basis of her disability– which

Defendant refused to accommodate, despite Plaintiff's requests– as more fully set forth above.

108.    The adverse employment actions alleged above directly and proximately caused

Plaintiff to suffer damages, including lost wages, lost benefits, emotional distress, humiliation,

intimidation, embarrassment, and frustration.

109.    The person or persons described above as employees of Defendant were agents of

the Defendant who were acting in the course and scope of their agency with Defendant or who

acted with express authority from Defendant.

110.    Defendant, through its agents or employees, acted outrageously by engaging in

discriminatory practices with malice or reckless indifference to Plaintiff's federally protected

rights.  Defendant is therefore liable for punitive damages in an amount sufficient to punish Defendant and to deter it and other employers from engaging in similar conduct.

WHEREFORE, Plaintiff prays for judgment against Defendant on Count III of her Complaint, for all actual damages and losses shown in evidence, and determined by a jury to be reasonable and fair, including, but not limited to:  an award of lost pay, including lost benefits, bonuses, and cost of living increases; an award of front pay; for any other compensatory damages; for pre-judgment interest;  for pain and suffering and emotional distress; for a finding that she has been subjected to unlawful discrimination in violation of Title VII and the ADA; for punitive damages, attorneys' fees, and all other damages, expenses, and costs incurred, and for other relief as the Court deems proper and just.

## COUNT VI.   RETALIATION FOR ENGAGING IN PROTECTED ACTIVITIES IN VIOLATION OF TITLE VII AND THE ADEA

111.    The Plaintiff hereby incorporates by each preceding paragraph as though fully set forth herein.

112.    The Plaintiff engaged in protected activity of reporting her experience of gender-based, age-based, and disability-based discrimination and filing two Charges with the EEOC,.

113.    Defendant retaliated against the Plaintiff for her protected activity, as more fully set forth above.

114.    As a direct consequence of Defendant's damages, Plaintiff has suffered and will continue to suffer adverse action.

115.    The adverse employment actions alleged above directly and proximately caused Plaintiff to suffer damages, including lost wages, lost benefits, emotional distress, humiliation, intimidation, embarrassment, and frustration.

116.    The person or persons described above as employees of Defendant were agents of the Defendant who were acting in the course and scope of their agency with Defendant or who acted with express authority from Defendant.

117.    Defendant, through its agents or employees, acted outrageously by engaging in discriminatory practices with malice or reckless indifference to Plaintiff's federally protected rights.  Defendant is therefore liable for punitive damages in an amount sufficient to punish Defendant and to deter it and other employers from engaging in similar conduct.

WHEREFORE, Plaintiff prays for judgment against Defendant on Count IV of her Complaint, for all actual damages and losses shown in evidence, and determined by a jury to be reasonable and fair, including, but not limited to:  an award of lost pay, including lost benefits, bonuses, and cost of living increases; an award of front pay; for any other compensatory damages; for pre-judgment interest;  for pain and suffering and emotional distress; for a finding that she has been subjected to unlawful discrimination in violation of Title VII and the ADA; for punitive damages, attorneys' fees, and all other damages, expenses, and costs incurred, and for other relief as the Court deems proper and just.

## COUNT VII. HOSTILE AND ABUSIVE WORKING ENVIRONMENT

118.    The foregoing paragraphs are reasserted and incorporated by reference as if more fully set forth herein.

119.    The Defendant's conduct as alleged above constitutes producing, fostering, and perpetrating a hostile and abusive working environment.

120.    The Defendant's actions and practices had the purpose and effect of creating a hostile workplace atmosphere that unreasonably interfered with Plaintiff's performance and enjoyment of her assigned duties as a tenured faculty member.

121.    Defendant's actions and practices were severe and pervasive

122.    Defendant's representatives, including Department chairs, College of Arts and Sciences deans, and the University's EEOC liaison knew, or should have known, of the discrimination described herein, but failed to take appropriate remedial action.

123.    By failing to conduct a good-faith investigation of complaints brought to these representatives, Defendant exacerbated the hostility that Plaintiff experienced within the environment of her workplace.

124.    Defendant, through its agents and employees, engaged in these discriminatory practices with malice and reckless indifference to Plaintiff's federally protected rights.

125.    The Defendant's conduct as alleged above created and perpetuated a hostile work environment in which Plaintiff labored, based upon Defendant's discriminatory actions and practices based on age, gender, disability and her engagement in protected communicative activity.

126.    As a direct and proximate cause of the actions, practices, and conduct set forth herein, Plaintiff has suffered significant and continuing damages, including emotional distress and inconvenience, as a result of Defendant's deprivation of her rights.

WHEREFORE, Plaintiff prays for judgment against Defendant on Count V of her Complaint, for all actual damages and losses shown in evidence, and determined by a jury to be reasonable and fair, including, but not limited to:  an award of lost pay, including lost benefits, bonuses, and cost of living increases; an award of front pay; for any other compensatory damages; for pre-judgment interest;  for pain and suffering and emotional distress; for a finding that she has been subjected to unlawful discrimination in violation of Title VII and the ADA; for

punitive damages, attorneys' fees, and all other damages, expenses, and costs incurred, and for other relief as the Court deems proper and just.

## COUNT VI:  BREACH OF CONTRACT

127.    The Plaintiff incorporates by reference the previous paragraphs as though more fully set forth herein.

128.    The Plaintiff and Defendant had an employment contract in which Plaintiff would render service in return for money.

129.    Further, the parties had an implied contract of employment.

130.    The Defendant breached the employment contract by refusing to abide by its own policies, practices, and procedures.

131.    The Plaintiff has mitigated her damages.

132.    The Plaintiff has sustained damages as a direct and proximate cause of the Defendant's breach.

WHEREFORE, the Plaintiff requests the Court to enter a judgment against the Defendant on Count VI of her Complaint in excess of $25,000, for actual and consequential damages incurred, for pre-judgment interest, for costs and fees, and for such other and further relief as the Court may deem just and equitable.

## JURY TRIAL DEMANDED

Plaintiff respectfully requests that the issues in this matter be heard by a jury.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby designates the Federal Court in Topeka, Kansas as the place of trial in this matter.

Respectfully submitted,

*/s/ Heather J. Schlozman*
**DUGAN SCHLOZMAN LLC**
Mark V. Dugan          Ks. Bar # 23897
mark@duganschlozman.com
Heather J. Schlozman Ks.  Bar # 23869
heather@duganschlozman.com
8826 Santa Fe Drive, Suite 307
Overland Park, KS 66212
Telephone:  (913) 322-3528
Fax:  (913)  904-0213

And

*/s/ Phillip M. Murphy II*
**LAW OFFICE OF PHILLIP M. MURPHY II LLC**
Phillip M. Murphy II  Ks. Bar # 23770
phillip@phillipmurphylaw.com
4717 Grand Ave., Ste. 250
Kansas City, MO 64112
Telephone:     (913) 661-2900
Fax:     (913-312-5841)

**Attorneys for Plaintiff**