## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

LESLIE J. REYNARD,

                              Plaintiff,

v.                                                        Case No. 5:19-cv-04012-HLT
                                                                    LEAD CASE

WASHBURN UNIVERSITY OF
TOPEKA,

                              Defendant.

─────────────────────────────────────────────

LESLIE J. REYNARD,

                              Plaintiff,

v.                                                        Case No. 5:19-cv-04061-HLT

WASHBURN UNIVERSITY OF
TOPEKA,

                              Defendant.

─────────────────────────────────────────────

LESLIE J. REYNARD,

                              Plaintiff,

v.                                                        Case No. 2:20-cv-02219-HLT

WASHBURN UNIVERSITY OF
TOPEKA,

                              Defendant.

─────────────────────────────────────────────

## MEMORANDUM AND ORDER

Plaintiff Leslie J. Reynard brings this employment discrimination action pro se[1] against her

former employer, Defendant Washburn University of Topeka. Plaintiff claims Defendant (1)

retaliated against her for engaging in protected activity in violation of Title VII of the Civil Rights

Act of 1964 (Title VII), the Americans with Disabilities Act (ADA), and the Age Discrimination

in Employment Act (ADEA); (2) discriminated against her based on her disability; and (3) failed

to accommodate her disability. Plaintiff alleges Defendant retaliated by investigating student

───────────────

[1]   The Court liberally construes Plaintiff's pro se filings and holds them to a less stringent standard than those drafted
      by lawyers. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But the Court does not assume the role of
      advocate. *Id.*

complaints and requiring that she be on two performance improvement plans (PIPs). Plaintiff alleges Defendant discriminated against her and failed to accommodate her disability by assigning her to a classroom with fluorescent lighting and delaying her transfer out of that classroom.

Defendant seeks summary judgment on all Plaintiff's claims.[2] Doc. 136. Plaintiff requests leave to file a surreply to Defendant's motion. Doc. 156. The Court denies Plaintiff's motion as untimely and alternatively denies it on the merits because Defendant did not inappropriately raise new arguments in its reply brief. And the Court grants Defendant's motion because (1) Plaintiff cannot seek compensatory or punitive damages for ADA or ADEA retaliation claims; (2) Plaintiff does not establish a prima facie case of Title VII retaliation or that Defendant's proffered reasons for its actions were pretextual; (3) Plaintiff fails to establish a prima facie case of disability discrimination or that Defendant's proffered reasons for its actions were pretextual; and (4) Defendant acted in good faith and accommodated Plaintiff's disabilities.

## I.     BACKGROUND[3]

### A.     The Actors

- <u>Plaintiff</u> was a tenured professor at Washburn in the Communications Studies department of the College of Arts and Sciences. She began working for Washburn in 2007.

- <u>Dr. Laura Stephenson</u> became the Dean of the College of Arts and Sciences in 2014.

---

[2]  Defendant filed the required "Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment." Doc. 138. Defendant also included a copy of D. Kan. R. 56.1. Doc. 138-2. At the top of the Rule 56.1 page is the text of D. Kan. R. 54.2, Award of Statutory Attorney's Fees. Plaintiff indicates she was troubled by the inclusion of the Rule 54.2 "financial warning" and asks the Court to "determine what, if any, remedy or consequence may be appropriate." Doc. 148 at 1. The Court finds nothing inappropriate or threatening about the inclusion of the full page 50 of the Court's Local Rules and takes no further action on Plaintiff's request.

[3]  For purposes of summary judgment, the facts set forth herein are uncontroverted or recited in the light most favorable to the nonmoving party. But the Court omits immaterial facts or facts presented through inadmissible evidence. Plaintiff presented many documents in the form of summary exhibits. She neither laid the proper foundation for the underlying documents nor complied with Fed. R. Evid. 1006. She also added her own commentary throughout the exhibits. The Court disregards Plaintiff's improper summary exhibits. But even if considered, the summary exhibits do not change the outcome of Defendant's motion.

- <u>Dr. Tracy Routsong</u> is the Assistant Dean in the College of Arts and Sciences. Routsong was also the chair of the Communications Studies department from August 2011 through January 2013. In that role, she oversaw the Communications Studies department's operations, supervised its faculty, and managed its staff.

- <u>Dr. Bruce Mactavish</u> served as an associate dean in the College of Arts and Sciences until July 31, 2019. He investigated and resolved student or faculty complaints about the academic environment. He specifically investigated complaints related to Plaintiff in 2018 and 2019. This was per normal protocol; Stephenson believed Mactavish to be reliable, fair, and accurate.

- <u>Dr. Kathy Menzie</u> was the chair of the Communications Studies department from July 2013 through July 2017.

- <u>Dr. Mary Pilgram</u> was chair of the Communications Studies department from August 2017 through July 2019.

- <u>Dr. Jim Schnoebelen</u> became Communications Studies department chair in the latter half of 2019.

- <u>Dr. Pam Foster</u> was Washburn's Director of the Office of Equal Opportunity. Until 2016, she handled employees' ADA accommodation requests. She transferred her ADA files to Human Resources (HR) in 2016.

- <u>Teresa Lee</u> has been Defendant's Director of HR since March 2016. Washburn's HR Department began processing employees' ADA accommodation requests under her leadership. HR asks that employees requesting accommodation complete a Disability and Impairment Assessment Form with a healthcare provider. Lee then initiates the interactive process to determine appropriate accommodations.

### B.    Overview of Relevant Events[4]

Both parties submit proposed facts dating back well before the relevant and actionable events of this case. In some instances, the ancient facts provide helpful context to the working environment of the Communication Studies department. They also are useful for establishing the state of mind of Plaintiff, her supervisors, and her colleagues. But most of them have little relevance to the question posed by this lawsuit: Between October 18, 2017 and December 2019, did Defendant retaliate or discriminate against Plaintiff for unlawful reasons and did Defendant fail to accommodate Plaintiff's disability? The facts relayed below are limited to those that are material and relevant to this question. They are presented in the form of a timeline because time is the only plausible connector between Plaintiff's complaints of discrimination and Defendant's actions.

- Before 2009 and Continuing through All Relevant Times: Plaintiff suffers from complex migraines. She had two mini strokes in 1979 and 1988 that were connected with her migraines. Plaintiff contends the first mini stroke was caused by exposure to fluorescent lighting and the second to extreme stress.

- 2009: Plaintiff requested and received an accommodation for a particular teaching schedule so she could care for her son. This is the only ADA accommodation the Office of Equal Opportunity or HR had on file for Plaintiff before 2017.

- Between 2012 and the end of 2017: Frustration built with Plaintiff and her "tone" when speaking with colleagues in Washburn's Communications Studies department. Intradepartmental relations were far from perfect before this time. But this time period

---

[4]   Plaintiff's colleagues at Washburn testified about many of the events described below during hearings in 2020 before the Faculty Appeals Committee that reviewed the eventual decision to terminate Plaintiff's employment. Plaintiff's termination is not at issue in this case. But the record is substantial because of other proceedings related to Plaintiff's employment.

seems to mark when Plaintiff's conflicts with colleagues began brewing. Routsong grew weary of what she perceived as "attacks" by Plaintiff and Plaintiff's friend and colleague, Dr. Sarah Ubel. Routsong told others about negative experiences she had with Plaintiff, including one in 2017 where Routsong claimed Plaintiff "berated" Routsong in front of her colleagues. Routsong told Marta Haut, an Associate HR Director, about this particular event. Others grew frustrated with Plaintiff during this same time. Menzie described difficulties managing Plaintiff's expectations, and Pilgram testified about how Plaintiff would essentially shut down department business during meetings with her "tirades." Pilgram understood Routsong stepped down as department chair in 2013 because of Plaintiff's ongoing attacks and conflict. Pilgram herself eventually took phased retirement largely because of ongoing difficulties with Plaintiff. But Pilgram did not make this decision until 2019.

- <u>January 14, 2014</u>: To prepare for a move to a temporary office space, Plaintiff sent an email marked "Confidential" to Menzie. The email informed Menzie that Plaintiff required a reasonable accommodation in the form of a "stable and reliable teaching schedule" that would allow her to keep medical appointments. Plaintiff also told Menzie about her complex migraines and that she needed lamps and natural lighting in her office space. She asked Menzie if she needed to make a formal accommodation request with HR. Menzie replied that she was sure they could make the lighting work and that Plaintiff did not have to submit anything special to her like a doctor's note.

- <u>February 2014</u>: Plaintiff emailed Tami Boten, the department secretary, to reiterate that Plaintiff needed to avoid the use of fluorescent light because of her neurological disability.

She also emailed Menzie, Boten, and the IT supervisor, John Haverty, to remind them she needed to avoid the use of fluorescent light in her office space.

- <u>Fall 2014 through Spring 2015</u>: Plaintiff took a sabbatical leave.

- <u>May 2015</u>: Menzie and Plaintiff discussed another office move. Plaintiff requested that she be able to use her own office furnishings due to "bona fide medical needs." Menzie asked if Plaintiff's ADA requirements were documented. Plaintiff responded that "[n]o one has asked me to fill out any paperwork although I offered." Doc. 154-7 at 3. Plaintiff said her new medical issues were going to require additional accommodations and asked where to get the appropriate forms. Less than a week later, Menzie talked with Foster about Plaintiff's ADA accommodation request. Foster told Menzie what Plaintiff needed to do, and Menzie emailed Plaintiff instructions for making an ADA accommodation request and a link to the Employee Medical Verification Form. Plaintiff never returned the form or medical documentation to Foster.

- <u>Fall 2015</u>: Plaintiff took FMLA leave from August 18 through November 9, 2015. Her documentation included "neurological issues, including complicated migraines." But the report did not mention light sensitivity. Her Certificate to Return to Work or School also mentions nothing about lighting restrictions.

- <u>Summer 2017</u>: Many of the Communications Studies classes were assigned to be taught in Henderson Hall for the fall semester, which was an unexpected change from prior semesters. Schnoebelen noticed the change in early summer and immediately requested and received a move to Morgan Hall. Others who had been placed in Henderson (including Plaintiff) did not notice the change until later.

- <u>August 19, 2017</u>: Plaintiff notified Pilgram that her classes were in Henderson Hall instead of Morgan Hall and stated, "This is a formal ADA request that my courses and that my classes be assigned to Morgan Hall in future semesters unless there is a compelling reason why they cannot be." Doc. 137-7 at 50. The email did not mention complex migraines or light sensitivity.

- <u>August 23-25, 2017</u>: Plaintiff and Pilgram traded emails about locating a new room for Plaintiff. Plaintiff mentioned that her request was a "reiteration of an ADA request."[5] But Lee told Stephenson that Plaintiff's ADA file did not have anything current in it. And Lee asked Pilgram to have Plaintiff complete a Disability and Impairment Assessment Form. Plaintiff told Pilgram she didn't understand why the information in her 2015 FMLA notification was inadequate. The 2015 FMLA forms did not include any information about light sensitivity.

- <u>September 20, 2017</u>: Plaintiff emailed Lee the documents Lee had requested.

- <u>September 28, 2017</u>: Plaintiff's classes were moved to Morgan 150 for the rest of the semester. Defendant displaced another professor to accommodate Plaintiff.

- <u>October 2017</u>: Defendant granted Plaintiff's request to have a service animal.

- <u>October 16, 2017</u>: Lee sent Plaintiff a follow-up letter regarding the classroom accommodation. She invited Plaintiff to contact HR in the future about any accommodation request.

---

[5]  Plaintiff's use of the term "reiteration" does not make it so. There is no evidence that Plaintiff formally requested an accommodation for her complex migraines and light sensitivity before August 2017. There is also no evidence that Defendant "retracted" a prior accommodation. Plaintiff's representation that she had a habit of disclosing she had a disability when she began new employment does not contradict this fact. Neither does her informal request in 2014 to Menzie to use her own lighting in her office. Perhaps Menzie should have referred Plaintiff to Foster or HR at that time. But she did not. HR and Pilgram cannot be charged with knowing Plaintiff had a light sensitivity when Plaintiff's 2014 request went no further than an exchange of emails between Plaintiff and Menzie.

- <u>January 2018</u>: Plaintiff made comments during a faculty "retreat" about how students like to take classes that the "easy" teachers teach. Pilgram thought Plaintiff's tone was insulting and demeaning to other faculty. After the meeting, Pilgram advised Plaintiff it was not appropriate to engage her colleagues like that. Lee recommended Pilgram document Plaintiff's unacceptable behavior. Pilgram updated Stephenson on the situation and Lee's recommendation.

- <u>April 13 or 18, 2018</u>:[6] Plaintiff made an online inquiry with the EEOC. An inquiry is not a charge. The EEOC online portal makes this clear and warns applicants that strict deadlines apply to filing a charge.

- <u>A few days after April 13 or 18, 2018</u>: Plaintiff told Pilgram that she had initiated an EEOC charge.

- <u>April 27, 2018</u>: D.B., a Washburn student, forwarded Stephenson an email thread between D.B. and Plaintiff. Stephenson forwarded it to Mactavish because he handled student concerns. Mactavish reviewed the email thread with Dean of Students Joel Bluml and university counsel Marc Fried.

- <u>May 29, 2018</u>: Mactavish sent a memo to Stephenson concluding, "On the whole, I find that [Plaintiff's] responses to the student were harsh and tend to misrepresent the words and intentions of the student. The online learning environment was compromised." Doc. 137-2 at 17. He also shared concerns Bluml and Fried expressed about Plaintiff's comments in the email exchange.

---

[6]   Plaintiff repeatedly refers to the date as April 13 throughout her briefing. She did not attach her inquiry as an exhibit to her summary judgment response. Although the Court does not consider her surreply, it notes that she did attach it as an exhibit to her proposed surreply. That exhibit shows the date of April 18, 2018. Doc. 158-3.

- <u>June 8 and 13, 2018</u>: Pilgram received two emails from students (J.B. and K.W.). Both shared concerns about email exchanges they had with Plaintiff. Pilgram's office did not solicit the complaints. Again, Mactavish investigated them.

- <u>June 29, 2018</u>: Mactavish and Pilgram sent a memo to Stephenson, summarizing the results of interviews with four graduate students who dropped Plaintiff's CN 695 (Visual Storytelling) course. The memo identified pedagogical concerns such as:

    o  "Students found that understanding and following [79 instructions, guidelines, and forms] seemed to [be] a primary focus rather than an emphasis on student learning";

    o  "Students frequently found the tone of the online learning environment to be negative";

    o  Many of Plaintiff's documents reflected "a lack of respect for students and an overall feeling that [Plaintiff] 'did not want us to engage with her' or 'question her.'"

    Doc. 137-2 at 44.

- <u>July 2018</u>: Stephenson and Pilgram discussed using a PIP to address Plaintiff's professional behavior, communication, and teaching. Washburn uses PIPs for all employees. Stephenson hoped the PIP would return Plaintiff to her pre-2018 teaching performance and address her collegiality issues.

- <u>August 14, 2018</u>: Plaintiff filed her first EEOC charge against Defendant.

- <u>August 15, 2018</u>: Plaintiff participated in a teleconference with Pilgram and Stephenson. They discussed Plaintiff's performance issues. Plaintiff denied she had performance issues.

- <u>August 29, 2018</u>: Plaintiff filed an amended EEOC charge against Defendant.

- <u>September 2018</u>: Pilgram, in consultation with Stephenson, placed Plaintiff on her first PIP. The PIP addressed Plaintiff's professional relationships and behavior. It also addressed her teaching. Plaintiff successfully completed this PIP.

- <u>February 2019</u>: Pilgram received more student complaints, which Mactavish investigated:

  o L.B., a CN 680 student, complained about the course and Plaintiff on February 15, 2019.

  o J.D., a CN 304 student, emailed his whole class (taught by Plaintiff) on February 20, 2019. J.D. advised the class that Plaintiff had filed a federal lawsuit and stated, "[W]e are being wrongfully looked over and deserve to have our complaints heard about the disorganization and lack of communication, and grading process, for this semester." Doc. 137-5 at 32. Pilgram received the email because she was on the class list. Pilgram forwarded the email to Stephenson.

  o A.Z. and L.C., both students in Plaintiff's CN 308 class, emailed Pilgram with complaints on February 24, 2019. Pilgram met with them two days later to discuss their complaints. She wanted to figure out whether there were widespread concerns within the class, so Mactavish surveyed ten CN 308 students out of a class of twenty-two.

- <u>March 8, 2019</u>: Mactavish sent another memo to Stephenson, summarizing his findings from interviews with the ten CN 308 students:

      8 students found the course organization to be confusing
      7 students found the course assignments to be confusing
      6 students mentioned that they had received little or no feedback on assignments
      5 students noted that the instructor took 4 to 5 weeks to grade assignments
      5 students noted frequently missed classes (perhaps 5 in the first month of the semester)
      5 students mentioned a terrible/rough start to the semester
      4 students expressed frustration with communication from the instructor
      4 students noted that the course has recently improved

  Doc. 137-2 at 51.

- <u>March 14-April 2, 2019</u>: Pilgram received two more student complaints and Mactavish received an email from a student (J.F.) who said he might need to file a formal complaint against Plaintiff. During this time, Pilgram stepped down as Plaintiff's supervisor and Stephenson began directly supervising Plaintiff.

- <u>April 3, 2019</u>: Stephenson notified Plaintiff that there had been a number of student complaints and requested that Plaintiff make an appointment to review a new PIP.

- <u>April 12, 2019</u>: Stephenson met with Plaintiff to review the new PIP, which addressed Plaintiff's teaching. Plaintiff disagreed with the PIP and alleged its goal was termination and was not performance improvement. But she continued to meet with Stephenson about her progress throughout the rest of 2019.

- <u>May 2019</u>: More students complained to Mactavish about Plaintiff's behavior. Plaintiff's spring 2019 course evaluations by students reflected frequent course cancellations, lack of feedback, and poor communication with students. Plaintiff rejected the evaluations because she felt the evaluation process was tainted and invalid.

- <u>June 6, 2019</u>: Stephenson sent Plaintiff an addendum to her second PIP and asked Plaintiff to schedule an appointment by June 14, 2019. Plaintiff didn't timely schedule the appointment, which instigated a number of increasingly hostile and defensive emails between Stephenson and Plaintiff. The two continued exchanging emails and met together a few times by telephone conference and in person. Plaintiff recorded most, if not all, of the meetings and had them transcribed.

- <u>Fall 2019</u>: Plaintiff taught classes but was out on FMLA leave for about a month. During her absence, Routsong covered some of Plaintiff's courses. Routsong reported issues to Stephenson about Plaintiff's course preparation before her leave. Schnoebelen, who was then department chair, received two student complaints about Plaintiff during this time.

- <u>October 24, 2019</u>: Plaintiff sent Lee information pertaining to a new ADA accommodation request. Plaintiff and Lee met to discuss the request in November.

- <u>November 14, 2019</u>: Lee sent Plaintiff a letter summarizing their discussion about Plaintiff's requested accommodations.

- <u>November 15, 2019</u>: Plaintiff filed her second EEOC charge against Defendant.

- <u>January 2020</u>: Stephenson sent a PIP summary to Vice President of Academic Affairs JuliAnn Mazachek. The summary concluded that Plaintiff had not shown improvement on the progress indicators for her PIP.

- <u>January 13, 2020</u>: Plaintiff filed her third EEOC charge against Defendant.

## II.     STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

### III.   ANALYSIS

The Court initially addresses a few preliminary matters: (1) whether Plaintiff's proposed surreply is proper (answer: no); (2) the permitted timeframe for Plaintiff's claims (answer: limited); and (3) whether Plaintiff can seek compensatory and punitive damages for her ADA and ADEA retaliation claims or punitive damages at all (answer: no). Then, the Court turns to the merits of Plaintiff's Title VII retaliation claim, followed by her ADA discrimination claim and ADA failure-to-accommodate claim. None of Plaintiff's claims survive the Court's analysis, and Defendant is entitled to summary judgment.

#### A.   Preliminary Matters

##### 1.   Plaintiff's Proposed Surreply

Defendant's summary judgment motion was fully briefed on August 29, 2022. On September 6, Plaintiff moved for leave to file a surreply because she claimed Defendant raised new issues in its reply brief. Doc. 156. But Plaintiff did not attach a proposed surreply to her motion, which is required by local rule. The Court ordered Plaintiff to file her proposed surreply on or before September 9 and warned her that failure to file on that date would result in denial of the motion with prejudice. Doc. 157.

Plaintiff submitted her proposed surreply by email to the Clerk's Office for filing on September 10, 2022—one day late.[7] September 10 was a Saturday. And Plaintiff did not copy Defendant on her email. The Clerk's Office, of course, was closed on Saturday, so Defendant did not see Plaintiff's proposed surreply until the Clerk's Office reopened and entered the document on the docket on Monday, September 12, 2022. The Court acknowledges that the timing did not

---

[7]   The Court verified the timestamp on Plaintiff's submission. Plaintiff's motion and exhibits all arrived on September 10 after 4:30 A.M.

necessarily prejudice Defendant; even if Plaintiff had submitted her proposed surreply on September 9 but after 5:00 P.M., Defendant likely would not have seen it until Monday. But potential prejudice is not the issue here. Compliance with the Court's order is.

Plaintiff's filing was late. To the extent Plaintiff may claim faulty equipment or internet availability is at fault, the Court does not accept those reasons as an excuse. This would not be the first time Plaintiff requested additional time due to technical complications, so she is aware of these potential issues and should have accounted for them. *See, e.g.*, Docs. 125 (noting Plaintiff's internet connectivity issues), 141 (seeking additional time to access online sources from outside institutions), 144 (seeking additional time in part because computer was being rebuilt).[8] Plaintiff was on notice of the Court's timeliness requirement, she failed to meet the deadline, and she never sought leave to file out of time or explain the delay (and now that time has passed). Deadlines are endemic in litigation and mean something. *See Reales v. Consol. Rail Corp.*, 84 F.3d 993, 996 (7th Cir. 1996) ("Part of [the district courts'] job means that they are entitled—indeed they must—enforce deadlines."); *see also Soliman v. Johanns*, 412 F.3d 920, 922 (8th Cir. 2005) (holding the district court didn't abuse its discretion when it enforced a deadline and denied further enlargement). Plaintiff missed this deadline. The Court therefore denies the motion with prejudice.

Even if the Court were to consider Plaintiff's tardy filing, the Court would still deny Plaintiff's motion on the merits. The Court carefully analyzed the reply. Defendant did not improperly raise new issues or argument in it. Defendant's arguments are in direct response to points raised and briefed by Plaintiff. There is no justification to allow a surreply.

---

[8] The Court recognizes that health concerns were also the source of Plaintiff's previous requests for additional time. The Court places no blame on Plaintiff for delays related to her health; these examples are only to show that because of past technical problems, perhaps Plaintiff should have acted proactively to offset anticipated technical difficulties.

### 2.    Temporal Scope of Case

Before bringing a claim in federal court, a plaintiff asserting employment discrimination claims must exhaust her administrative remedies. *Al-Ali v. Salt Lake Cmty. Coll.*, 269 F. App'x 842, 846 (10th Cir. 2008) (Title VII). A plaintiff exhausts her claims by filing a charge with the EEOC, and a plaintiff has 300 days from the date of an incident to file this charge. *Id*. Plaintiff filed her charge on August 14, 2018, so only discrete acts occurring after October 18, 2017 are actionable. Plaintiff has also limited her own contentions to events before December 2019. She did not administratively exhaust her termination before or during this case. The Court therefore limits the actionable discrete acts to those that occurred between October 18, 2017 and December 2019.

Plaintiff repeatedly reiterates in her response that she filed her EEOC charge on April 13, 2018, when she allegedly submitted an online EEOC inquiry. An inquiry is distinct from an actual charge. There may be times when an inquiry can serve as a charge. *See, e.g.*, *Martinez v. Prairie Fire Dev. Group, LLC*, 2019 WL 3412264, at *3 (D. Kan. 2019) (citing *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008)). But to determine whether an inquiry can serve as a charge, the Court must review the content and characteristics of the inquiry. *See* 29 C.F.R. § 1601.12. Plaintiff failed to include her inquiry for the Court to review with her response or offer any argument on why her inquiry constitutes a charge. The Court will not supplement the record for her or make arguments on her behalf.[9]

---

[9]    Defendant's original brief clearly identified timeliness as an issue. Doc. 137 at 34-35. But Plaintiff never explained in her response why the Court should use her "EEOC charge initiation" date (April 13, 2018) instead of Defendant's date (August 14, 2018). The EEOC inquiry should have been attached to the response brief as an exhibit. After Defendant identified this omission, Plaintiff attached a copy of her inquiry to her proposed surreply brief. Doc. 158-3. But the Court finds no surreply is warranted. The Court therefore will not consider the content of Plaintiff's inquiry (which is dated April 18, 2018—not April 13, 2018 as Plaintiff recites). Regardless, it is debatable to say the least as to whether it would constitute a charge; the inquiry repeatedly refers to the "Potentially Charging Party," is unverified and unsigned, and does not identify the remedy sought from the EEOC. *See generally Martinez*, 2019 WL 3412264, at *4-*5. Plaintiff fails to explain why the inquiry should constitute a charge under

### 3.    Compensatory and Punitive Damages

Plaintiff only seeks compensatory and punitive damages. Doc. 131 at 17-18. Defendant argues that neither are available for ADA or ADEA retaliation claims and that punitive damages are not available for any of her claims. Plaintiff completely ignores this argument and has now forfeited her ability to respond to it.

Regardless, neither compensatory nor punitive damages are available for ADA retaliation claims. *See Boe v. AlliedSignal Inc.*, 131 F. Supp. 2d 1197, 1203 (D. Kan. 2001); *Sandin v. Unified Sch. Dist. No. 500, Wyandotte Cty., Kan.*, 2021 WL 425961, at *2, n.13 (D. Kan. 2021) (listing District of Kansas cases holding the same). Plaintiff does not seek compensatory or punitive damages for her ADEA retaliation claim. Doc. 131 at 17. This appears to be an oversight. But, in any event, they are also unavailable under the ADEA. *See Marshall v. BNSF Ry. Co.*, 2020 WL 128054, at *2-4 (D. Kan. 2020) (explaining why compensatory and punitive damages are not recoverable under an ADEA retaliation claim); *see also Villescas v. Abraham*, 311 F.3d 1253, 1259 (10th Cir. 2002) (noting damages for emotional distress are not available under the ADEA). And finally, punitive damages are unavailable for any of Plaintiff's claims because Defendant is a political subdivision 42 U.S.C. § 1981a(b)(1); *see* Kan. Const. art. 6, § 2(c); K.S.A. § 13-13a03, *et seq.*; K.S.A. § 74-3102b(d).

---

*Holowecki*. Instead she reiterates that the "numbers" on the inquiry and charge are the same and blames the EEOC's backlog of cases. The Court will not be Plaintiff's advocate and create arguments for her. But even if Plaintiff's inquiry was a charge, then the outcome of her motion remains the same. The difference in filing dates allows the Henderson Hall assignment in August 2017 to be considered, but Plaintiff still fails to meet her burden on either claim relating to the 2017 events. She does not show pretext as she does not establish that Schnoebelen is similarly situated or show any other evidence from which a reasonable jury could find in her favor. And she still fails to meet her burden on the reasonable accommodation claim.

These limitations mean that Plaintiff's ADA and ADEA retaliation claims are not viable. The Court grants summary judgment for Defendant on these two claims.[10] Defendant is also entitled to summary judgment on any claim for punitive damages. This leaves for the Court's further consideration Plaintiff's claims for Title VII retaliation, disability discrimination, and failure to accommodate.

### B.    Remaining Retaliation Claim (Title VII)

Plaintiff claims Defendant retaliated against her for engaging in protected activity. Where a plaintiff only has indirect or circumstantial evidence of discrimination (as is the case here), the *McDonnell Douglas*[11] burden-shifting framework applies. *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015). Under this framework, a plaintiff must first establish a prima facie case of retaliation under Title VII. This requires a plaintiff to show: (1) she engaged in protected activity; (2) she suffered an adverse employment action during or after her protected activity, which a reasonable employee would have found materially adverse; and (3) there was a causal connection between the protected activity and the adverse action. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013).

The plaintiff's burden at the prima facie stage of the analysis is not onerous; only a minimal showing is necessary. *Id.* at 1216. If the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate legitimate, non-discriminatory reasons for its adverse employment actions. *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 896 (10th Cir. 2017). If the employer does

---

[10]    Even if the Court didn't grant summary judgment on Plaintiff's ADA and ADEA retaliation claims on this basis, summary judgment would remain appropriate. All the reasons Plaintiff's Title VII retaliation claim fails (as discussed in the next section) apply equally to Plaintiff's ADA and ADEA retaliation claims.

[11]    *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

so, the burden shifts back to the plaintiff to show that the employer's stated reasons for its actions are mere pretext for discrimination. *Id.*

### 1.       Prima Facie Case

As noted above, there are three elements of Plaintiff's prima facie retaliation case. Defendant doesn't dispute Plaintiff can meet the first element. Plaintiff engaged in protected activity when she filed an EEOC charge, later amended it, and then filed additional charges. The Court therefore turns directly to whether Plaintiff suffered an adverse employment action and whether she can show causation.

### a.       Materially Adverse Employment Action

There are only two actions here that are potential materially adverse employment actions: (1) Defendant's investigation of student complaints; and (2) institution of the two PIPs.[12] An adverse action is one that might have dissuaded a reasonable employee from engaging in the protected activity. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). To qualify as adverse, an employer's action must result in "a significant change in employment status," such as termination, failure to promote, or ineligibility for things like promotions. *Aquilino v. Univ. of Kan.*, 268 F.3d 930, 934 (10th Cir. 2001). Courts in this District have held that written warnings and evaluations making employees temporarily ineligible for transfer or promotion sufficiently impact their future employment opportunities to give rise to an adverse employment action. *See*

---

[12] Plaintiff identifies the potentially adverse employment actions as "including shunning, removal of authority over her teaching, being subjected to invasive and improper administrative scrutiny of her medical history and her professional competence as a professor, being harangued to travel to Topeka for PIP meetings during summer months when she was not being paid and being placed in a dangerous workroom for 10 weeks that could have led to her permanent crippling or death from ischemic stroke." Doc. 148 at 47. But Plaintiff includes this list in her discussion of pretext—not adverse employment actions. And none of these items are significant enough to constitute an adverse employment action. Under "Adverse Employment Actions," plaintiff only mentions the episode in 2017 where she was assigned to teach in Henderson Hall with fluorescent lighting. But the Henderson Hall assignment happened before Plaintiff filed an EEOC charge. The Court has given Plaintiff the benefit of the doubt in analyzing the two most significant actions here and analyzing the 2017 Henderson Hall assignment in the context of Plaintiff's disability claims.

*Budenz v. Sprint Spectrum, L.P.*, 230 F. Supp. 2d 1261, 1276 (D. Kan. 2002). But mere increased supervision or application of policy does not qualify as an adverse employment action. *Keller v. Crown Cork & Seal USA, Inc.*, 491 F. App'x 908, 914 (10th Cir. 2012) (finding no materially adverse employment action where the plaintiff complained of "strict application of policies, increased supervision, write-ups, means and methods of communication with her supervisors, and restrictions on her employment relationships").

### i.    Investigation of Student Complaints

Defendant's investigation of student complaints amounts to nothing more than an application of policy. Defendant presented evidence that it did not solicit negative statements from students. Students initiated contact with Plaintiff's colleagues about Plaintiff's behavior. Stephenson's referral of the matters to Mactavish for investigation was normal protocol. And the investigation itself did not materially impact Plaintiff's employment in any way. Defendant's investigation did not constitute a materially adverse employment action, and no reasonable jury could find otherwise.

### ii.    Performance Improvement Plans

Placing Plaintiff on two PIPs also does not constitute materially adverse employment actions. *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1172-74 (10th Cir. 2018); *see also Anderson v. Clovis Mun. Sch.*, 265 F. App'x 699, 704 (10th Cir. 2008) (finding "growth plan" that did not affect compensation or terms, conditions, or privileges of employment was not an adverse employment action in disparate treatment case). The PIPs Defendant implemented for Plaintiff are similar to the plan in *Payan*. The *Payan* plaintiff's PIP identified the following areas of improvement: written and verbal communication, planning and organization, and managing of subordinates. 905 F.3d at 1173. The plaintiff was required to attend a monthly meeting to check

progress and to use a daily planner. *Id.* Plaintiff's PIPs sought improvement in Plaintiff's communication, professionalism, teamwork, and organization. Stephenson's goal for the PIPs was to improve Plaintiff's collegiality and return Plaintiff to pre-2018 teaching performance levels. And Stephenson required Plaintiff to attend meetings with her to discuss progress. As in *Payan*, Plaintiff's EEOC inquiry and eventual charge "did not immunize [her] from any attempt by [Defendant] to improve deficiencies in [her] job performance." 905 F.3d at 1173.

Plaintiff may not have enjoyed having her actions monitored through implementation of the two PIPs, but they do not constitute the type of material adverse action that is required for a prima facie case of retaliation. Plaintiff even successfully completed her first PIP. It was only after Defendant received and investigated more student complaints that Stephenson decided to place Plaintiff on a second plan. Plaintiff's salary was not reduced. Her classes were not taken away. There is simply no evidence that the PIPs resulted in any kind of tangible negative impact on Plaintiff.

Plaintiff has not met the "materially adverse employment action" element of her prima facie case, so Defendant is entitled to summary judgment. Nevertheless, to assure Plaintiff it has fully considered the merits of her claims, the Court proceeds with the full *McDonnell Douglas* analysis.

### b.     Causation

Even if Plaintiff were able to establish that she was subjected to a materially adverse employment action, she cannot establish causation. To causally connect Plaintiff's EEOC inquiry or charge with Defendant's investigations or PIPs, Plaintiff must present "evidence of but-for causation . . .  based on more than mere speculation, conjecture, or surmise." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1209 (10th Cir. 2018) (quotation omitted). A court may presume causation if

an adverse employment action is very closely tied in time. *See EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011). But if intervening events occurred between the protected activity and the adverse action, evidence of temporal proximity has minimal probative value. *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1001-02 (10th Cir. 2011).

This case involves multiple "intervening events," which were the continued receipt of unsolicited student complaints. Plaintiff is quick to note that she told Pilgram about her EEOC inquiry when Pilgram approached her about the first PIP. But Plaintiff cannot insulate her actions from criticism by making sure everyone in authority knows she has complained of discriminatory treatment. Indeed, time is the only connector Plaintiff has between her complaints and the investigation and PIPs.

Another problem with causation lies in Plaintiff's own statements. Plaintiff testified, "There was never any active retaliation until I filed my EEOC charge and lawsuit." Doc. 154-6 at 305-06. The Court understands that Plaintiff is confused about whether beginning an EEOC inquiry constitutes <u>filing</u> an EEOC charge. (It doesn't always.) But this statement, if taken at face value, suggests that no action before August 14, 2018 can be considered retaliatory. By this time, Mactavish had already completed two investigations and Stephenson and Pilgram had discussed using a PIP. Plaintiff further undermines her claim with a statement she made in the pretrial order: "Thus, the EEOC issue only partially triggered the termination process in April 2018. The other, more critical element was expressing concern that CN and CAS were awarding CN degrees to students who did not complete curriculum requirements." Doc. 131 at 9. This is consistent with Plaintiff's position throughout the case and her briefing; she believes others treated her badly because she held herself and others to higher educational standards and was not supportive of

bestowing "meaningless" degrees on students.[13] Plaintiff's position is admirable but not actionable under Title VII (or the ADA or ADEA). The retaliation must be responsive to protected activity related to Plaintiff's gender, disability, or age—not Plaintiff's crusade to improve higher education standards at Washburn. Plaintiff has not established causation, so her retaliation claim fails for this alternative reason.

### 2.    Legitimate, Non-Retaliatory Business Reason

Having found that Plaintiff has not established her prima facie case, the Court need not proceed with the remainder of the *McDonnell Douglas* analysis. But even assuming Plaintiff had demonstrated a prima facie case, Defendant has offered legitimate, nondiscriminatory reasons for its actions. Defendant's burden at this stage is "exceedingly light," requiring only production—not persuasion. *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1149 (10th Cir. 2011).

Defendant spent multiple pages in its brief explaining why its investigation of complaints was justified and why it needed to place Plaintiff on PIPs. Suffice it to say, Defendant investigated because students complained about Plaintiff's actions and treatment of them. And Defendant instituted the PIPs because it had reports of faculty and students who were upset about Plaintiff's treatment of them. Defendant regularly used PIPs as tools to improve its employees' work product. Defendant has sufficiently shown it had legitimate, non-retaliatory business reasons for its actions.

### 3.    Pretext

Because Defendant offers legitimate, non-discriminatory reasons for its actions, the burden reverts to Plaintiff to show the proffered explanations are "more likely" pretexts for discrimination. *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007). Plaintiff has not carried that

---

[13]   Plaintiff makes a similar statement in her briefing: "[A]dministrators found her focus on accountability and rule[] to be an impediment to their nonacademic goals." Doc. 148 at 39.

burden. Typical avenues for demonstrating pretext include providing evidence that (1) the stated reason is false, (2) the defendant acted contrary to its written policies, and (3) the plaintiff was treated differently than similarly-situated employees. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017). In analyzing a plaintiff's claim of pretext, courts examine the facts as they appear to the individual making the employment decision; the court's role is not to "second guess" the employer's business judgment. *Id.*; *see also Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) ("[O]ur role is to prevent intentional discriminatory . . . practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments."). Nor is the court's role to ask whether the decision was wise, fair, or correct. *Dewitt*, 845 F.3d at 1307. Rather, the court must determine whether the employer honestly believed the legitimate, non-discriminatory reason it gave for its conduct and acted in good faith on that belief. *Id.* Mere conjecture that the employer's explanation is pretext is not enough to justify denial of summary judgment. *Id.*

Temporal proximity is one factor that can lead to a finding of pretext, but it is not enough standing alone. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1236 n.10 (10th Cir. 2015). Unless the proximity is very close, it must be combined with other evidence to suggest that the stated reason for the adverse employment action is unworthy of belief. *Id.*; *see also Hysten v. Burlington N. Santa Fe Ry. Co.*, 296 F.3d 1177, 1183-84 (10th Cir. 2002) (noting that a three-month period between the protected conduct and termination is not sufficient to raise an inference of retaliation).

A plaintiff may also show pretext by demonstrating that she "was treated differently from other similarly situated, nonprotected employees who violated work rules of comparable seriousness, provided the similarly situated employee shares the same supervisor, is subject to the same performance standards, and otherwise faces comparable relevant employment

circumstances." *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 489 (10th Cir. 2006) (quoting *Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005) (internal quotations omitted)). "Individuals are considered 'similarly-situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of 'comparable seriousness.'" *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 801 (10th Cir. 2007). But not every difference in treatment points to discriminatory intent; differences explained by nondiscriminatory motives do not establish pretext. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000).

As the Court has already indicated, time is the only potential connector between Plaintiff's protected activity and Defendant's actions. Plaintiff has no other evidence that the stated reasons for investigating student complaints and placing her on PIPs are unworthy of belief. She has not identified a policy violation or an irregularity in policy application.[14] She has not shown that faculty or student complaints were untrue (although she does disagree with their interpretation). The timing of events is insufficient, standing alone, to demonstrate that the reasons for Defendant's actions were pretext for retaliation.

Plaintiff does suggest that Defendant favored other employees. But she has not presented evidence that other faculty with similar student complaints were treated differently. She is upset that Schnoebelen got his classrooms moved more quickly than she did in 2017. But she offers nothing but speculation for the reason and fails to show that he and she are similarly situated.

---

[14] Plaintiff says the Court can find pretext from "the inconsistencies, or incoherencies in Defendant's explanation for its actions with respect to Plaintiff between April 28, 2018 and December 5, 2019 [which can be cited from too many exhibits to list here and the 3700 page hearing transcript, as well as evidence this Court has reviewed in this Opposition]." Doc. 148 at 46. The Court will not sift through Plaintiff's 130 statements of additional fact to find evidence to support her pretext argument. It is her responsibility to connect the facts to her legal conclusion. *Triple-I Corp. v. Hudson Assocs. Consulting, Inc.*, 713 F. Supp. 2d 1267, 1274 (D. Kan. 2010).

Plaintiff has not proffered any evidence to suggest that Defendant's reasons for investigating and placing her on PIPs is unbelievable or implausible.

The only connector of Plaintiff's EEOC charge to Defendant's actions is time. And the time is broken multiple times by intervening acts by different students. Plaintiff has presented no evidence suggesting an issue of material fact exists about whether Defendant's actions were retaliatory in nature. And no reasonable jury could find in her favor on this record. The Court grants summary judgment on Plaintiff's remaining retaliation claim.

### B.    Disability Discrimination

Plaintiff's next claim is that Defendant discriminated against her because of her disability. The ADA prohibits covered employers from discriminating against "a qualified individual on the basis of disability in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In the absence of direct evidence of discrimination, ADA disability discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting scheme. *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 896 (10th Cir. 2017). The Court will not apply the test again in detail here, as many of the considerations and outcomes are the same as with Plaintiff's retaliation claim. And there is another problem with this claim: Plaintiff's disability discrimination allegations center on the 2017 Henderson Hall assignment. Strictly applying the exhaustion requirements, this entire claim is time-barred because it was resolved before October 18, 2017 (300 days before Plaintiff filed her EEOC charge). Summary judgment is thus appropriate for this reason alone. But, even if not time-barred, the claim still fails the *McDonnell Douglas* test.

First, to establish a prima facie case of ADA disability discrimination, the plaintiff must show: (1) she either is disabled or perceived as disabled under the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of her job; and (3) she

suffered discrimination because of her disability. *Williams*, 849 F.3d at 896. The plaintiff endures "discrimination" within the meaning of the third prong when she suffers an adverse employment action because of her disability. *Id*. The same problems plague this claim as with Plaintiff's retaliation claim. None of Defendant's actions constitute an adverse employment action. Here, the allegedly adverse action is assigning Plaintiff to a classroom with fluorescent lights. But there is no evidence that the classroom assignment impacted Plaintiff's employment status or had any lasting impact. And there is even less support for a causation finding. Plaintiff repeatedly asserts that Pilgram knew about her complex migraines and the need to avoid fluorescent light. Plaintiff claims that over the years, Pilgram must have known about Plaintiff's disability based on her observations of Plaintiff and Plaintiff's commentary about "nice lighting." This is not enough to infer actual knowledge, particularly when Pilgram has sworn that August 2017 is the first time she knew of Plaintiff's disability.[15] Moreover, Pilgram was not responsible for classroom assignments; Janet Schneider in Scheduling handled the assignments. Plaintiff's prima facie case on her disability discrimination claim is even weaker than on her retaliation claim.

      Second, Defendant has offered a legitimate, non-discriminatory reason for placing Plaintiff in an unacceptable classroom. The placement was a department-wide mistake. Plaintiff was not the only impacted professor. Defendant adequately explained how and why the mix-up occurred.

      Third, Plaintiff cannot show pretext. Plaintiff attempts to show that Schnoebelen was given classroom transfers much faster than she was. But Schnoebelen noticed his Henderson classroom assignment in early summer and proactively sought a move. Plaintiff did not notice the assignment

---

[15] Plaintiff repeatedly refers to this experience as a retraction or rescission of a previously-granted accommodation. But she had no formal accommodation on file (other than for a schedule that accommodated her need to care of her son). The fact that Menzie had told Plaintiff in the past no paperwork was necessary does not forever exempt Plaintiff from submitting documentation for her disability if requested by HR. And Plaintiff's statement that she "always" checked the disability box when completing paperwork for a new job is insufficient to establish that there was a box to check in her onboarding paperwork for Defendant. There is no such document in Plaintiff's HR file.

or request a move until the semester was about to begin. And as soon as Plaintiff notified the department of her medical need, Defendant began the process of documenting Plaintiff's medical condition and looking for ways to accommodate Plaintiff's condition. Plaintiff is upset with how long the process took. But the process is intended to be interactive. And given that part of the time was spent waiting for Plaintiff to submit papers from her doctor, there is no evidence to suggest Defendant was "dragging its feet." Plaintiff has presented no evidence from which the Court can infer Defendant's proffered legitimate, non-discriminatory reason for the erroneous placement was pretextual. Summary judgment is appropriate on this claim as no reasonable jury could find in Plaintiff's favor.

### C.    Failure to Accommodate

The Court now turns to Plaintiff's failure to accommodate claim. The ADA provides a cause of action for disabled employees whose employers fail to reasonably accommodate them. 42 U.S.C. § 12112(b)(5)(A). Failure to accommodate claims are not analyzed under the *McDonnell Douglas* framework; rather, the Tenth Circuit has developed a modified burden-shifting framework under which courts are to assess such claims. *Punt v. Kelly Servs.*, 862 F.3d 1040, 1050 (10th Cir. 2017).

Under this modified framework, the plaintiff must first establish a prima facie case: (1) that she is disabled under the ADA, (2) that she is "otherwise qualified," and (3) that she requested a "plausibly reasonable accommodation." *Id*. Once the plaintiff makes this showing, the burden shifts to the employer to present evidence either rebutting one or more elements of the prima facie case or establishing an affirmative defense. *Id*. If the employer does either of these things, summary judgment is appropriate unless the plaintiff can produce evidence establishing a genuine dispute

regarding the affirmative defenses or rehabilitates any of the challenged elements of his prima facie case. *Id*.

An employee must inform her employer of her disability and requested accommodation, or the disability must be "obvious," before the employer can be held liable for a failure to accommodate. *Ewing v. Doubletree DTWC, LLC*, 673 F. App'x 808, 810-14 (10th Cir. 2016). Upon learning of the disability, the employer has a duty to engage in an interactive process to determine the employee's precise limitations and reasonable accommodations. *Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 916 (10th Cir. 2004).

Like Plaintiff's disability discrimination claim, Plaintiff's failure-to-accommodate allegations center on the 2017 Henderson Hall assignment. This means the failure-to-accommodate claim suffers from the same timeliness malady as Plaintiff's disability discrimination claim, which alone warrants summary judgment. But, even if considered, the Court briefly discusses below why Plaintiff's failure-to-accommodate claim otherwise fails. First, the record indicates Defendant made good faith efforts to accommodate her disability/ies. And second, Defendant actually did accommodate her disabilitiy/ies.

### 1.    Good Faith Efforts

The applicable law prohibits an award of compensatory or punitive damages in reasonable accommodation cases "where the covered entity demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation." 42 U.S.C. § 1981a(a)(3). The uncontroverted record shows that Defendant made a good faith effort. As soon as Plaintiff notified Pilgram that she could not teach in Henderson Hall because of her light sensitivity, Pilgram had Plaintiff work with HR to get the proper paperwork on file and find a new room for Plaintiff.

Beyond the Henderson Hall episode, there is additional evidence that Defendant made good faith efforts to comply with the ADA. Lee proactively reached out to Plaintiff in October 2018 to see if she had and ADA restrictions after she was in an accident. And Lee reached out to Plaintiff again in the summer of 2019 to update her 2009 accommodation. Lee once again worked with Plaintiff in 2019 to address Plaintiff's ten ADA requests raised at that time. There is no evidence suggesting Defendant failed to use good faith efforts to accommodate Plaintiff's disabilities.

### 2.      Actual Accommodation

Finally, Defendant did provide Plaintiff with actual accommodation, multiple times. Defendant permitted Plaintiff a flexible teaching schedule in 2009. Defendant displaced another professor to give Plaintiff the classroom in 2017. Defendant allowed Plaintiff a service dog in 2017. And Defendant was working through the interactive dialogue for Plaintiff's requested accommodations in 2019.

Plaintiff maintains that Defendant unjustifiably retracted or rescinded her accommodation for complex migraines. She claims her practice is to inform employers of her disability when she starts and Pilgram knew of her light sensitivity. She also points to her agreement with Menzie that she could use her own lighting in her office. But none of these claims is supported by evidence that Plaintiff completed the required ADA paperwork, gave it to HR, or participated in the interactive process. A critical element of an accommodation claim is a request by the plaintiff—putting the employer on notice of its duty to accommodate. *C.R. England, Inc.*, 644 F.3d at 1049. An employee must inform the employer that she has a disability and request appropriate accommodation before the employer can be liable. *Ewing v. Doubletree DTWC, LLC*, 673 F. App'x 808, 810 (10th Cir. 2016). "[A] vague, informal, and non-specific request does not qualify

as a request for a plausibly reasonable accommodation." *Mayfield v. Target Corp.*, 2019 WL 5576938, at \*9, n.7 (D. Kan. 2019); *Punt*, 862 F.3d at 1050-51.

Defendant did not retract or rescind a prior accommodation because Plaintiff did not formally request it. Defendant may not be held responsible for a request that was never made. The ADA requires more.

## IV.   CONCLUSION

The uncontroverted evidence shows that Plaintiff does not have a submissible case for the jury on any of her claims. Plaintiff cannot seek compensatory or punitive damages for ADA or ADEA retaliation claims. She does not establish a prima facie case of Title VII retaliation or that Defendant's proffered reasons for its actions were pretextual. She fails to establish a prima facie case of disability discrimination or that Defendant's proffered reasons for its actions were pretextual. And Defendant acted in good faith and accommodated Plaintiff's disabilities. Defendant has shown it is entitled to summary judgment on all Plaintiff's claims against it.

THE COURT THEREFORE ORDERS that Plaintiff's motion for leave to file Surreply (Doc. 156) is DENIED.

IT IS FURTHERED ORDERED that Defendant's motion for summary judgment (Doc. 136) is GRANTED. The case is closed. Under Fed. R. App. P. 4(a), Plaintiff has 30 days from the date of judgment to appeal.

IT IS SO ORDERED.

Dated: October 5, 2022                    /s/  *Holly L. Teeter*
                                          HOLLY L. TEETER
                                          UNITED STATES DISTRICT JUDGE